## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHELLE MARTIN,                :
     Plaintiff,              :
                             :      CIVIL ACTION NO.
     v.                  :      3:01 CV 2189 (SRU)
                             :
DUPONT FLOORING SYSTEMS, INC.  :
and DUPONT COMMERCIAL     :
FLOORING SYSTEMS, INC.,      :
     Defendant.            :

## RULING ON DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiff, Michelle Martin ("Martin") sued her former employer, DuPont Flooring Systems, Inc. (formerly known as DuPont Commercial Flooring Systems, Inc.) ("DuPont"), for breach of contract, promissory estoppel, negligent misrepresentation, breach of implied covenant of good faith and fair dealing, fraud and discrimination on the basis of sex. Martin filed her initial complaint on November 26, 2001 and her first amended complaint on September 10, 2002. DuPont moved for summary judgment on August 15, 2003 (doc. #32). DuPont filed a supplemental memorandum in support of its initial motion for summary judgment on December 15, 2003, in response to Martin's October 23, 2002, second amended complaint. For the reasons that follow, DuPont's motion for summary judgment is GRANTED.

I.     **Factual Background**

The following facts are undisputed.  Martin worked as a DuPont sales associate from April 1999 until October 2000, selling carpet and other flooring materials primarily to corporate customers.  Jory Dennison ("Dennison"), vice president of DuPont's Stamford office, offered Martin a job in sales for DuPont at a salary of $65,000/year, plus reimbursement for automobile expenses.  Dennison represented to Martin over the telephone that after three months of work, Martin would receive additional training, a commission compensation plan and a review for consideration of a five thousand dollar raise.

At approximately the same time Martin was considering employment with DuPont, she was evaluating employment options with two other companies.  Her former employer and former fiancé, Daniel Grant, offered Martin an opportunity to return to her prior place of employment in Ohio.  Martin testified that she "wasn't going to go down that road . . . again," but preferred to stay in Connecticut.  (Martin Dep. at 45, 48.)  She was also in communication with a former co-worker about the possibility of joining his new company, Vanguard Flooring.  Martin did not pursue employment with Vanguard Flooring because she believed that, as a new company, it faced an uncertain future.  (Martin Dep. at 51.)  Martin began working for DuPont on April 19, 1999.

DuPont did not raise Martin's salary after three months.  At no time in 1999 did DuPont provide her with training or a bonus plan.  Martin brought her concerns about this state of affairs to Dennison and other DuPont management in 1999 and 2000.  In June 1999, Martin voiced her objections to vice president Greg Keyes ("Keyes").  In August 1999, she met with Keyes and manager Henry Grobert ("Grobert").  In December 1999, Martin also met with regional vice

president Mike Solecki ("Soleki") regarding the same matters.  Although she was given

assurances by Keyes and Sokecki, the circumstances of Martin's employment did not change.

On or about February 14, 2000, DuPont provided Martin with a personalized

compensation package.  She did not receive a better or different package from any DuPont

representative.  (Martin Dep. at 148-49.)  The terms of the package she received specified the

following:

> **Base Salary:** $71,500 (Including car allowance)
> Bonus structure: 1 to 1 on gross profit of projects capped at 33% of
> the gross profit amount.  (I.E. project closes at 20% GP commission
> Payable @20% of the gross profit.)
>
> **Minimum commission criteria:** commission will be payable after
> 350 k in gross profit is achieved at level 6.  No commission payable for
> projects closed @12% or less.  Commission paid on monthly basis.
>
> Salary will be retroactive to January 1, 2000.

This package raised Martin's salary, removed her automobile allowance and established a bonus

plan with precise parameters.  Initially, Martin did not sign off on her compensation package. At

that time, Martin was acutely concerned with the terms of her compensation package because she

had been playing a pivotal role in a multi-million dollar contract with Purdue Pharma ("Purdue"),

a contract finalized on or about January 28, 2000.

Unhappiness over her compensation package led to a strained relationship with Dennison,

her supervisor.  Martin began reporting to Solecki in DuPont's Wallingford office.  In September

2000, Martin asked Solecki if she could have an advance on her commissions.  Solecki told

Martin that she was not yet entitled to such a payment.  Martin ultimately signed her

3

compensation package on September 11, 2000.  At that time, Martin also e-mailed Solecki to inform him that she would be leaving for a vacation in three days.  Solecki e-mailed Martin back asking that in the future she follow office procedure, which required giving additional notice for vacation requests.

On or about September 28, 2000, Solecki told Martin to report to Dennison.  Martin objected.  Solecki met with Martin on October 20, 2000.  At that meeting, Solecki commented on Martin's relationship with Dennison, criticized Martin's sales forecast and chastised Martin for the way in which she requested leave for vacation.  On October 25, 2000, Solecki gave Martin a written performance counseling record and told her that she would be reviewed in thirty days. Martin resigned immediately thereafter.  Solecki asked Martin to stay, asking her to call him at home if she reconsidered.  Martin did not call Solecki that night.  Martin returned to work the next day to tell Solecki she had reconsidered.  When she arrived, Dennison asked her to return her cell phone and keys, then escorted her out of the building.

## II.    Procedural History

On April 10, 2001, Martin filed a complaint of discrimination on the basis of sex pursuant to Title VII of the Civil Rights Act with the U.S. Equal Employment Opportunities Commission ("EEOC").  The EEOC concluded that the information provided by Martin was insufficient to establish a violation of Title VII, but issued a right to sue letter on August 31, 2001.  Martin received the right to sue letter on or about November 5, 2001.  On November 26, 2001, Martin filed this complaint for sex discrimination, breach of contract, promissory estoppel, negligent misrepresentation, breach of implied covenant of good faith and fair dealing and fraud.

On August 15, 2003, DuPont moved for summary judgment on all counts.

### III.    Standard of Review for Summary Judgment

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When there can be no difference between the conclusions of reasonable minds, summary judgment is proper. Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), cert. denied, 506 U.S. 965 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof at trial, then summary judgment is appropriate. Id. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23.

## IV.     Discussion

### A.     Breach of Contract

Martin's breach of contract claim alleges that DuPont failed to fulfill its contractual compensation obligations.  Breach of contract is an "unjustified failure to perform all or any part of what is promised in a contract."  District Cablevision Limited Partnership v. Bassin, 828 A.2d 714, 720 (D.C. App. 2003); see also In re R. Hoe & Co., 508 F.2d 1126, 1129 (2d Cir. 1974).  In Connecticut, plaintiffs claiming breach of contract must prove the following elements: the existence of a contractual agreement; breach of such agreement; and the plaintiff suffered resulting damages.  Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993).

Assuming facts in the light most favorable to Martin, the contract between Martin and DuPont required that DuPont consider Martin for a raise, provide her with training and produce a compensation package outlining the terms of her commission compensation after three months of work.  Although DuPont failed to fulfill these promises at least until the early part of 2000, nine months after she began working with DuPont, Martin has not demonstrated that she has suffered any damage because of the lapse.  The core of Martin's claim does not relate to the delay in providing her with training or compensation details, but with the failure to actually compensate her.  Martin cannot, show, however, claim that she should have been offered any bonus compensation scheme better than or different from the one outlined above, nor can she show that she demonstrated a work product sufficient to *require* that upon review she would have automatically been entitled to a salary increase.  In other words, there is no reason to assume that had Martin been reviewed, she would have been given a raise.

6

Under the compensation scheme Martin was actually offered, she would receive a commission for sales only under certain circumstances.  First, Martin could not receive commissions until gross profits on her sales reached $350,000 for that calendar year.  Second, she could only earn commissions on sales with a profit margin of over 12%.  Third, she could not collect commission payments of more than 33% of the gross profit amount of a particular sale.  Fourth, and for present purposes most significantly, Martin could not collect a commission bonus until her sales had reached a "level 6."

Level 6 means that the work on the job has been completed and the customer has paid the full amount of the contract price to DuPont.  (Brewer Aff. ¶ 9.)  Martin does not dispute this interpretation of level 6.  She notes that she was under the impression that level 6 meant that the job was simply "closed out," which she understood to mean that DuPont's work was completed, but not necessarily paid for.  Ultimately, a DuPont employee explained to Martin that in order for a job to reach level 6, DuPont must have both completed the work and collected on the bill in full.  (Martin Dep. at 142.)  Martin provides no evidence to suggest otherwise.

Martin offers no indication that in either 1999 or 2000, she achieved gross profits at level 6 that were at or above the $350,000 threshold.  Martin's largest job, the Perdue contract, did not achieve level 6 until 2002, long after she had resigned from DuPont.  According to Michelle Brewer ("Brewer"), a DuPont Business Analyst, during 1999 Martin achieved gross profits of level 6 on $19,976.05.  Gross profits on those sales with a profit margin over 12% was $19,023.82.  During 2000, Martin achieved gross profits of level 6 on $49,927.99.  Gross profits on those sales with a profit margin over 12% was $48,606.46.  In neither year did Martin achieve the necessary $350,000 to qualify for commission compensation.

7

Martin objects to the admission of Brewer's affidavit on grounds that Brewer was not disclosed to plaintiff's counsel as required for purposes of initial disclosure pursuant to Rule 26(a). However, DuPont submitted a prior affidavit from Brewer on October 11, 2002 in connection with its opposition to Martin's motion to compel. Martin was thus put on notice that Brewer was available for discovery purposes. Even absent Brewer's affidavit, Martin provides no evidence to suggest that Martin achieved gross profits amounting to the necessary $350,000. There is no evidence to suggest that Martin entered into a better or different contract with DuPont or that Martin fulfilled the preconditions necessary to collect commission payments under the existing contract. Also, particularly in light of Martin's years of experience in the industry, Martin points to no damages stemming from DuPont's failure to provide her with additional training. Thus, Martin is unable to put forth evidence from which reasonable jurors could find that she suffered any damages as a result of any breach on the part of DuPont.

For these reasons, summary judgment on the breach of contract claim is granted.


### B.    Promissory Estoppel, Negligent Misrepresentation, Fraud

Martin's second count (promissory estoppel), third count (negligent misrepresentation) and fifth count (fraud) all require a showing of detrimental reliance. In order to make out a promissory estoppel claim, a plaintiff must demonstrate "a clear and unambiguous promise, a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." Cyberchron Corp. v. Calldata Sys. Dev., 47 F.3d 39, 44 (2d Cir. 1995). A claim of negligent misrepresentation in Connecticut requires a showing that a party "supplie[d] false information" through failure to

"exercise reasonable care or competence in obtaining or communicating the information" and the plaintiff suffered a financial loss because of reasonable reliance on the information.  Foy v. Pratt & Whitney Group, 127 F.3d 229, 233 (2d Cir. 1997).  In order to prove a fraud claim, a plaintiff must show that another party made a false representation submitted as fact, that the statement was both untrue and known by the uttering party to be untrue, that it was made to induce reliance and that the other party did detrimentally rely on the statement.  Law v. Camp, 116 F. Supp. 2d 295, 308 (D. Conn. 2000).

Thus, in order for Martin to make out a sufficient claim on any of these three counts, she must show both that she relied on statements by DuPont and that she suffered a loss as a result.  Martin identifies five instances of potential detrimental reliance.  First, Martin claims to have abandoned her prior position in reliance on DuPont's representations to her about the benefits and compensation she would receive at DuPont.  Martin ultimately acknowledged, however, that she did not leave her previous job to accept DuPont's offer.  (Martin Dep. at 39, 55.)  Second, Martin asserts that she suffered detrimental reliance by turning down or failing to pursue other employment opportunities.  In her papers, Martin cites to only two other possible sales positions: one with Vanguard Flooring and another with Decorative Flooring.  Martin testified that she turned down Decorative Flooring because she had decided not to return to Ohio and to the romantic relationship that she understood would accompany the job offer.  Furthermore, Martin had decided not to go back to Ohio before she contacted Dennison to follow up about a job opportunity with DuPont, at which time Martin and Dennison discussed the possible $5,000

raise. (Martin Dep. at 58-59.)[1]  Thus, chronologically, she could not have relied on DuPont's

salary representations when she decided to turn down the offer from Decorative Flooring.  With

regard to the second opportunity, Martin testified that she rejected an offer from Vanguard

because working for a new company offered an unstable future.  Moreover, Martin testified that

her exchanges with Vanguard resulted not in an actual offer of employment, but simply a "verbal

back and forth." (Martin Dep. at 50.)  Ultimately, Martin cannot attribute her decision to decline

to pursue these offers to any action undertaken or statement made by DuPont representatives.

Third, Martin cites to DuPont's alleged misrepresentation about the income differential

between salaried and commissioned employees.  Martin alleges that DuPont offered her a choice

between a salaried and a commission sales position, but does not give any indication that DuPont

made misrepresentations, or even any specific representations, about the relative compensation

attached to each position.  Fourth, for purposes of her promissory estoppel claim, Martin alleges

that she relied on statements by DuPont to her detriment because she did not seek employment

elsewhere.  Her fifth and related claim is that she detrimentally relied on DuPont's

representations by remaining with DuPont as a sales associate.  Although not binding precedent

on this court, it is instructive to note that another court in this district has specifically found that

"[f]orbearance from seeking job opportunities is not sufficient to show detrimental reliance for

purposes of promissory estoppel."  Croslan v. Housing Auth. for the City of New Britain, 974 F.

---

[1]  Martin's testimony here is confusing and contradictory.  On page 48, she is asked when she told Decorative Flooring she was not coming back.  She answered March of 1999.  She indicated that this was *after* she had accepted a job with DuPont.  On page 59, she is asked about the chronology of events and explains that she went to Ohio, made a decision not to return to Ohio, then when she returned from Ohio, she contacted Dennison to follow up with DuPont.  It appears that she does not represent that at any time prior to turning down the offer from Decorative Flooring that she spoke with Mr. Dennison about the now contested $5,000 raise.

Supp. 161, 168 (D. Conn. 1997); see also D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 219 & n.5 (Conn. 1987). Martin has provided no reliable indication of the number of jobs in her field possibly available to her. Mere speculation about available opportunities in the flooring sales industry is insufficient to withstand a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11-12 (2d Cir. 1986). None of Martin's alleged instances of detrimental reliance amount to actual reliance on representations made by DuPont for which she suffered harm.

For these reasons, summary judgment is granted on the claims of promissory estoppel, negligent misrepresentation and fraud.

### C.    Breach of Implied Covenant of Good Faith and Fair Dealing

Martin's fourth claim is that DuPont breached its implied covenant of good faith and fair dealing. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Habetz v. Condon, 224 Conn. 231, 238 (1992); see also Warner v. Konover, 210 Conn. 150, 154-56 (1989); Procaccino-Hague v. Boll Filter Corp., 2004 U.S. Dist. LEXIS 431 at *13-14 (D. Conn. 2004). The implied covenant of good faith and fair dealing serves to protect the reasonable expectations of the parties to the contract. Iosa v. Gentiva Health Servs., 299 F. Supp. 2d 29, 35 (D. Conn. 2004).

Claims of breach of an implied covenant of good faith and fair dealing require allegations beyond mere breach of contract. Id. at 10. In order to make out a claim of breach of an implied covenant of good faith and fair dealing, a plaintiff must prove the existence of a contract between

11

plaintiff and defendant.  Hoskins v. Titan Value Equities Group, Inc., 252 Conn. 789, 793

(2000).  Breach of the implied covenant of good faith and fair dealing, however, is a cause of

action independent from breach of contract.  Buckman v. People Express, Inc., 205 Conn. 166,

170-71 (1987); see also Cornerstone Realty, Inc. v. Dresser-Rand Co., 993 F. Supp. 107 (D.

Conn. 1997).

　　　In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff

must prove three elements.  Franco v. Yale Univ., 238 F. Supp. 2d 449, 455 (D. Conn. 2002).

First, the plaintiff must show that the plaintiff and defendant entered into a contract under which

the plaintiff had a reasonable expectation of benefits.  Second, the plaintiff must show that the

defendant undertook actions that served to undermine the plaintiff's right to collect certain

benefits.  Third, the plaintiff must show that the defendant, in so injuring the plaintiff's right,

acted in bad faith.  Activities done in bad faith are those prompted by "some interested or sinister

motive" and are "more than mere negligence . . . involv[ing] a dishonest purpose."  Fairfield Fin.

Mortg. Group, Inc. v. Salazar, 2002 Conn. Super. LEXIS 1352 at *9 (Conn. Super. 2002)

(internal citations omitted).

　　　Although Martin has sufficiently demonstrated that she entered into an employment

contract with DuPont, under which she could reasonably expect certain benefits, not all of her

expectations were reasonable.  Martin had a reasonable expectation of timely receipt of

compensation, but she does not provide evidence upon which reasonable jurors could conclude

that she had a reasonable expectation that her compensation package would contain any specific

terms.  For example, at no time did DuPont represent to Martin that she would be able to collect

commission proceeds from her sales prior to total completion of the contract, including receipt of

payment by DuPont.  Thus, although Martin had a reasonable expectation that she could ultimately collect commissions on contracts she procured, she had no reasonable expectation of receiving compensation for any contract prior to that contract reaching level 6 completion.

Martin also had a reasonable expectation that she would not be constructively discharged.  As previously discussed, however, Martin was not constructively discharged, but chose to leave DuPont of her own volition.  Her termination of employment, therefore, did not implicate the covenant of good faith and fair dealing.

It is unnecessary to discuss specifically each of the allegations set forth in support of Martin's claim of breach of the covenant of good faith and fair dealing.  Almost all of them are addressed elsewhere in this opinion.  Martin has repeated various claims but recharacterized them as breaches of the covenant of good faith and fair dealing; doing so does nothing to strengthen their merits.  Indeed, it weakens their merits because Martin has not presented evidence sufficient to permit reasonable jurors to find bad faith on the part of DuPont on those claims.  In the absence of a showing of bad faith, none of Martin's arguments in support of this claim can withstand summary judgment.

For the foregoing reasons, summary judgment on the covenant of good faith and fair dealing claim is granted.

### D.     Sex Discrimination

In her sixth claim, Martin alleges that DuPont discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act ("Title VII").  Martin alleges discrimination under both disparate treatment and disparate impact theories.

In order to establish a *prima facie* case for sex discrimination under Title VII, a plaintiff must show that she is a member of a protected class, performed her duties satisfactorily, was subject to an adverse employment action and such action gave rise to an inference of discrimination on the basis of membership in the protected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); see also Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994); Rosen v. Thornburgh, 928 F.2d 528, 532 (2d Cir. 1991). Having made that initial showing, the burden then shifts to the defendant to articulate a nondiscriminatory reasons for its acts. St. Mary's, 509 U.S. at 506-07. Finally, the plaintiff must demonstrate that the proffered explanation is a mere pretext for unlawful discrimination. Id. at 515. As a woman, Martin is undeniably a member of a protected class. DuPont acknowledges Martin's satisfactory job performance by recognizing her substantial contributions to the Purdue and other sales contracts. Martin fails, however, to put forth evidence on which a jury could find that she suffered an adverse employment action or that any such action occurred under circumstances giving rise to a discriminatory inference.

An adverse employment action is a "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted). Such change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (internal citations omitted). Martin argues that she suffered adverse employment actions when DuPont: (1) failed to adequately compensate and train her, (2) disciplined her and (3) constructively discharged her. DuPont provides an explanation for each alleged adverse employment action. First, with regard to Martin's compensation, DuPont presents evidence of similarly situated male sales associates

14

working during Martin's tenure with DuPont, making less income than Martin.  One male sales

associate working in 1999 and 2000 received $60,000/year in salary plus a $350 monthly car

allowance and a 5% commission on all closed, fully paid contracts.  Another male sales associate

working in 1999 and 2000 received a draw of $50,000/year against commissions with a

$125/month car allowance until 2000, when his draw went up to $51,500/year with no car

allowance.  Martin believes this evidence to be unpersuasive because sales associates could opt

to take less of a draw.  It is not clear why the option to take less of a draw makes the base salary

numbers of similarly situated male employees irrelevant.  Martin fails to explain how her own

compensation package is inferior to or less appropriate to her experience and education than

those referenced above.

Martin claims that because Craig Tiefiethaler, her replacement hired in 2001, was offered

a 2002 salary of $75,000, Martin's initial compensation package was inferior and a product of

sex discrimination.  However, Martin received a 10% raise from 1999 to 2000.  It would be

reasonable to assume that had Martin stayed with DuPont an additional year, she would have

received another 10% salary increase, bringing her salary for 2001 up to $78,650 and her salary

for 2002 up to $86,515.  Mr. Tiefiethaler's 2002 salary was $75,000, $11,515 less than Martin

would presumably have been making at that time.

Moreover, the Federal Reserve estimates annual inflation for 2000 at 3.4% and for 2001

at 2.8%.[2]  The rate of inflation alone would raise Martin's base salary to $73,931 in 2001 and to

$76,001.06 in 2002.  In other words, inflation by itself, absent any discretionary salary increase,

---

[2]  The Federal Reserve's website at www.federalreserve.gov, refers visitors to the Federal
Reserve Bank of Minneapolis for interest rates, posted by year at www.minneapolisfed.org.

would have raised Martin's base salary to $1000 more than Mr. Tiefiethaler's salary by 2002. Martin offers no evidence that DuPont's salary to her was out of step with the industry standard and, as discussed previously, Martin cannot claim that DuPont ever paid her less than promised under any salary or compensation package offered to her. Martin's salary went up from $65,000 in 1999 to $71,500 in 2000, thus with regard to her salary, the change in the terms of her employment were not adverse, but beneficial.

Second, with regard to training, DuPont notes that, although Martin was not granted permission to attend one specific training session, she nevertheless managed to very successfully carry out her job functions. She has pointed to no additional training made available to similarly situated male sales associates. The only training opportunity to which Martin refers instructed employees on business development topics, not sales. Furthermore, DuPont sent another female employee to the training session in Martin's stead. Martin has not shown that DuPont offers these explanations with respect to training as pretext for sex discrimination.

Third, Martin claims her disciplinary meeting rose to the level of an adverse employment action. However, DuPont notes that, at or about the time of Martin's reprimand, a male DuPont employee was similarly scolded. The Second Circuit held that "a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." Weeks v. New York State (Division of Parole), 273 F.3d 76, 86 (2d Cir. 2001). Martin's disciplinary meeting addressed procedures for vacation requests, sales numbers and the difficult working relationship between Martin and her supervisor, all matters well within the parameters of facilitating employee development and improvement. Whether or not DuPont's concerns were well-founded, nothing in this exchange

16

suggests an inference of discrimination. The disciplinary meeting did not deprive Martin of meaningful terms and conditions of her employment. DuPont's reasonable explanation of the need to meet with Martin shifts the burden back to Martin to show pretext. She has failed to do so.

Finally, Martin claims that DuPont constructively discharged her by creating an inhospitable workplace environment in which reasonable employees would feel compelled to go elsewhere. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996) (internal citations omitted). Working conditions are intolerable if they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. Mere reprimand is insufficient to show constructive discharge. Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360-61 (2d Cir. 1993); Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156-57 (2d Cir. 1993). Mere dissatisfaction with resource allocation in the absence of a change of title, status or salary is equally insufficient. Godfrey v. Ethan Allen, Inc., No. 96-7978, 1997 U.S. App. LEXIS 12334, at *11-12 (2d Cir. 1997). To make out a constructive discharge claim, Martin also must point to some intentional act on the part of her employer to create such an environment. Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000). In light of the fact that Solecki asked Martin to stay, giving her an opportunity to reflect and contact him should she change her mind, Martin has not offered evidence of any such intentional act on the part of DuPont. Reasonable jurors could not find that an employee in Martin's situation had no choice but to leave DuPont.

17

The requisite adverse action under Title VII must also suggest an inference of discrimination. Preferential treatment of similarly situated persons outside that protected class can create such an inference. Hargett v. National Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996). Statistical evidence proving discrimination can lead to the same conclusion. If an employer passes up a qualified candidate for promotion or hire and continues to seek applications from prospective employees, this too can create an inference of discriminatory intent. McDonnell Douglas, 411 U.S. at 802; Meiri v. Dacon, 759 F.2d 989, 995-96 (2d Cir. 1985). Circumstantial evidence about surrounding events and employer behavior can likewise yield this kind of inference. Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 183 (2d Cir.1992); Dister v. Continental Group, Inc., 859 F.2d 1108, 1115 (2d Cir. 1988).

In support of both her claim of disparate treatment and disparate impact, Martin highlights a number of alleged instances of preferential treatment on the basis of sex. To make out a claim of disparate impact, a plaintiff must identify a "particular employment practice that causes a disparate impact on the basis of . . . sex." 42 U.S.C. § 2000e-2(k)(1)(A).[3] Although Martin does not pin down one specific discriminatory "practice," she offers numerous instances of what she believes to be sex discriminatory behavior within the company. Martin claims that

---

[3] Martin's papers suggest that this is no longer the law, but the only case she cites for this proposition restates the requirement that for a plaintiff to make out a *prima facie* disparate impact case, he or she must identify "a specific employment practice which, although facially neutral, has had an adverse impact on her as a member of a protected class." Smith v. Xerox Corp., 196 F.3d 358, 368 (2d Cir. 1999). Although amendments to Title VII have permitted plaintiffs to "focus on an employer's overall decision-making process as the cause of a disparate impact," this is an exception to the general rule permitted only "if the plaintiff can show that the elements of the employer's decision-making process are not capable of separation for analysis." Id. at 368. Martin has made no such showing.

whereas male salespersons were credited for all their sales in accordance with their contracts, she was not. She provides no indication of how and under what circumstances male employees were credited with sales, nor any insight into the substance of the employment contract of any particular male employee, save Craig Tiefiethaler who did not work at DuPont during Martin's tenure, much less the employment contracts of "all male employees." In her complaint, Martin refers to the compensation packages offered to male salespersons as "different" from those she received herself. Deposition testimony from Keyes and Solecki reveals that some male sales associates earned less and some earned more than Martin. Without a more probing look at the relative training and work experience of each additional employee, reasonable jurors could not infer discrimination from the fact that not all employees are paid identical wages. Martin contends that all male salespersons received training and benefit programs upon employment or soon thereafter. Nothing in the record supports this assertion, nor is there any reason to find that such delay constitutes a material adverse change in employment because Martin successfully performed her job despite her lack of training and would not have received additional commission compensation had the package been provided earlier.

Martin claims that DuPont supervisors for male salespeople did not refuse to meet or talk with them despite their failure to extend the same courtesy to Martin. On no basis provided by either the plaintiff or the defendant could reasonable jurors conclude that any or all male sales associates had unbridled access to DuPont supervisors. Martin claims that male salespeople did not have automobile and/or mileage allowances removed from their benefit compensation plans, but DuPont cites to a particular example in which a male employee did lose his automobile allowance. Moreover, the only male sales associate employment contract Martin provides, that

19

of Craig Tiefiethaler, provides for the exact same allowances for automobile-related expenses that were offered to Martin.  In both Martin's and Tiefiethaler's contracts, such expenses were subsumed within the employee's salary.  Martin argues that she received a compensation deduction for New York staff while male employees did not, but again, there is absolutely no evidence from which a jury could make this finding.

Martin alleges that male employees who offered two weeks' notice were allowed to remain at work during that departure period, yet she was not.  Martin cannot claim to have been harmed by the early departure because she was compensated for those weeks. (Plaintiff's Ex. 19.) She notes that males with lesser or similar experience were selected for promotions over Martin and, in a related complaint, Martin was never offered a management position.  It is true that Martin was never offered a management position, but it is not clear that management positions became available, that male employees filled those positions, that Martin was interested in such positions, that she expressed such interest or that fewer than two years' employment with DuPont was sufficient experience for a promotion to management status.

Martin attempts to further substantiate her sex discrimination claims with reference to a single piece of statistical data.  Martin notes that, according to "defendant's own numbers" of available workers in the industry, 53.9% are female whereas DuPont employed only 19.8% female sales staff in 1999 and 17.6% in 2000.  By "defendant's own numbers," Martin means plaintiff's exhibit 15, entitled "National Labor Data."  There is no additional identification attached to this document to give any indication of who authored it or if DuPont has adopted or relied on it in any way.  It appears to identify U.S. census data from 1990, quantifying officials, managers, professionals, engineers, and sales workers in (among other things) "Mfg. Wholesale

20

Trade."  In addition to the fact that there is no reason to attribute these number to DuPont, these figures provide far more questions than answers.  How do the U.S. Census numbers compare to the numbers actually available in Connecticut?  How have the numbers changed in the fourteen years since this census?  Of those available female sales workers in "Mfg. Wholesale Trade," how many specialize in commercial flooring?  DuPont is not required to provide an exact gender mirror of the population in its sales force.  The Second Circuit has held that "to make out a prima facie case the statistical disparity must be sufficiently substantial to raise an inference of causation."  Smith, 196 F.3d at 365.  This single statistic does not rise to the requisite level and reveals no insight into DuPont's employment practices.

For the aforementioned reasons, Martin's claim for sex discrimination under Title VII cannot withstand summary judgment.

## V.    Conclusion

For all the reasons stated above, DuPont's motion for summary judgment (doc. # 32) is GRANTED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 31st day of March 2004.


    /s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge