UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHELLE MARTIN, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 301CV02189 (SRU) |
| v. | : | |
| | : | |
| DUPONT FLOORING SYSTEMS, INC. | : | |
| and DUPONT COMMERCIAL | : | |
| FLOORING SYSTEMS, INC., | : | |
| | : | |
| Defendants. | : | APRIL 30, 2004 |

DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR RECONSIDERATION

On March 31, 2004, this Court granted summary judgment in favor of defendants DuPont Flooring Systems, Inc. and DuPont Commercial Flooring Systems, Inc. (collectively "DuPont Flooring"). See Ruling on Defendant's Motion for Summary Judgment, Docket #60 ("Ruling"). Plaintiff Michelle Martin has moved for reconsideration of that decision. The well developed record in this case does not support Ms. Martin's arguments. Indeed, the issues raised in the Motion for Reconsideration were fully addressed in prior briefs and the Court's Ruling. For these and the reasons stated below, the Motion for Reconsideration should be denied.

A.    Breach of Contract

There are two separate claims for breach of contract addressed by the Motion for Reconsideration: (1) a claim for unpaid bonus/commission and (2) a claim for failure to give Ms. Martin a raise after 3 months of employment.

1.    The Bonus Claim

The only bonus program DuPont ever offered Ms. Martin was only "payable after 350k in gross profit is achieved at Level 6." In the DuPont system, "Level 6" means that the work has been completed and the customer has paid for the work. Affidavit of Michelle Brewer, dated August 12, 2003 ("Brewer Aff."), ¶9 (annexed at Tab 5 to Defendants' Appendix In Support Of Their Motion For Summary Judgment, dated August 14, 2003 ("Appendix")). The gross profits achieved at Level 6 on Ms. Martin's jobs was substantially below $350,000 in both years she worked for DuPont. Ms. Martin has offered no evidence to contradict any of these points.

In her Motion for Reconsideration, Ms. Martin's attorney states that it was "nonsensical" to believe that bonus contracts are done on an annual basis. Memorandum in Support of Motion for Reconsideration, dated April 9, 2004 ("Martin's Reconsideration Memo."), at 4.[1] Ms. Martin herself, however, testified as follows:

---

[1]    In connection with this argument, Ms. Martin asserts that there are three factual issues: " a. When the commission is earned; b. When a sale is booked for the purpose of documenting when a sale is credited to the employee; and c. What happens to the sales credit if the employee leaves." Martin's Reconsideration Memo., at 3-4.

> Q. What was your understanding about it on an annual basis?
>
> A. That you'd have to reach your required sales per year.
>
> Q. Okay.
>
> A. That's typically in the industry how it works.
>
> Q. Okay. So you understood it to mean that every year before you could get a bonus, you'd have to get 350,000 in gross profits?
>
> A. Correct.
>
> Q. And then you'd start to get a bonus?
>
> A. Correct.

Deposition of Michelle Martin, dated December 12, 2002 ("Martin Dep.") at 138 (All deposition testimony is in appendices previously filed with the Court). Thus, Ms. Martin was quite clear that <u>bonuses were calculated on an annual basis</u> and that that type of annual calculation was standard in the industry.

Ms. Martin also argues that DuPont changed its definition of "Level 6" during the course of her employment from "closed-out" to "fully paid" but this argument is not supported by the record. The only issue suggested by the record concerns Ms. Martin's own understanding of the term "Level 6." <u>See</u> Defendant's Reply Memorandum In Support of Its Motion For Summary Judgment dated September 12, 2003 ("Reply Mem."), at 1-3. Ms. Martin testified that initially she did not know what "Level 6" meant. Martin Depo. at 138. At some point she asked a woman who worked in an

administrative function about "Level 6" and was told that it meant the job was "closed out." Martin Depo. at 139, 140.  Ms. Martin interpreted this statement to mean that she would get paid when the work was done, but <u>before</u> the customer paid, but Martin herself did not testify that she was ever told that directly.  See Memorandum in Opposition to Summary Judgment at 8 and Martin Depo. at 139-141.  Later, according to Ms. Martin, she was in fact told that "Level 6 was indeed once it [the job] was paid."  Martin Depo. at 142.  Other than her own interpretation of the term "closed out" used by an administrative employee, however, Ms. Martin offers no evidence that "Level 6" ever meant anything other than that the job was fully paid.

In support of her personal interpretation of the term "Level 6," Ms. Martin argues that she ought to have received a bonus before work was fully paid for by the customer because the "Defendant admitted at oral argument for this motion, that the Stamford branch (A.K.A. Dennison) received <u>its</u> bonus on the Purdue job in <u>early 2001 – a year prior to the job reaching level 6</u>.  Martin's Reconsideration Memo., at 4.  Although counsel for DuPont does not recall making such a specific admission during the course of oral argument, the fact is there is no evidence in the record that <u>any</u> bonuses were ever given that were based on profits earned from the Purdue Pharma sale.  In fact, Michael Solecki testified that no such individual or branch bonuses were awarded.  <u>See</u> Deposition of Michael Solecki, dated at page 99, line 16 – page 100, line 20.

Moreover, even if Ms. Martin's personal interpretation of the term "Level 6" were supported by evidence, which it is not, her claim still cannot withstand summary judgment. In order to create a triable issue of fact, Ms. Martin would have to provide evidence that under her erroneous definition of "Level 6" she would have been entitled to a bonus. Nowhere does Ms. Martin provide any evidence that work was completed on jobs in the year 2000 (or 1999) the gross profit for which exceeded $350,000. The work on Ms. Martin's largest job, the Purdue Pharma job, was not completed in the year 2000.

2.  "Promise" of a Raise

Ms. Martin testified that Mr. Dennison told her that he would consider Ms. Martin for a raise after three months of employment. Martin Dep. 64, line 23 – 65, line 16. See Defendants Supplemental Memorandum In Support of Their Motion For Summary Judgment dated December 12, 2003 ("First Supplemental Mem.") at 2-4. Such a promise to review Ms. Martin's work after three months and consider her for a raise was discretionary. The Court correctly concluded that there was no evidence in the record that suggests that Ms. Martin "demonstrated a work product sufficient to *require* that upon review she would have automatically been entitled to a salary increase." Ruling at 6. In her Motion for Reconsideration, Ms. Martin's argues that the mere fact she was "kept on" as an employee is sufficient to establish her entitlement to a raise. Martin's Reconsideration Memo. at 7. This argument is without merit. Ms. Martin's own

description of the promise made to her was a raise conditioned on performance, not continued employment. Martin Dep. at 64, line 23 – 65, line 16.

Finally, Ms. Martin argues that the Court failed to consider the credibility of witnesses' affidavits in its determination of the contract claim and that "the credibility of these statements should not be simply accepted when there is evidence contrary to the positions taken." Martin's Reconsideration Memo. at 7. In fact, DuPont's Motion for Summary Judgment relied principally on the testimony of Ms. Martin herself, and only where Ms. Martin presented no evidence related to a particular issue, did DuPont rely on affidavits and testimony of other witnesses. In fact with regard to the claim for a raise after 3 months employment, DuPont relied exclusively on the testimony of Ms. Martin because no other witness agreed that such a promise had ever been made.

To the extent that the affidavits and testimony of other witnesses were referred to at all was more than the burden on a summary judgment motion required of DuPont. The defendant in a summary judgment motion can point to the absence of evidence in a well developed record, like this one, and the plaintiff must demonstrate that there is evidence in support of her claim. Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986). Thus, Ms. Martin's suggestion that the Affidavit of Michelle Brewer is not credible should not serve as a basis for reconsideration. Despite a huge volume of financial records produced in discovery, the plaintiff points to no evidence that $350,000 in gross profit was achieved at "Level 6" in either 1999 or 2000, under either her personal definition of "Level 6" or the

- 6 -

actual meaning of that term. Summary judgment on the contract claim was, therefore, appropriate.

B.   Promissory Estoppel, Negligent Misrepresentation and Fraud

Each of the claims of promissory estoppel, negligent misrepresentation and Fraud required Ms. Martin to prove that she relied on DuPont's representations to her detriment. In its Ruling, the Court concluded, based on Ms. Martin's own testimony, that she did not rely on DuPont's representations in turning down other potential positions at the time of her hire by DuPont. Ruling at 9-10. Citing to the chronology laid out by Ms. Martin's testimony, the Court noted that Ms. Martin turned down the offer to work at Decorative Flooring in Ohio before she spoke to Mr. Dennison about the specifics of DuPont's alleged promise of a $5,000 raise and a bonus structure. Martin Dep. at 59-60. Similarly, with regard to the potential position with Vanguard Flooring, the Court noted that Ms. Martin testified that she turned that job down because it was a potentially unstable start up (Martin Dep. at 51) and that job did not make her a firm offer of employment but rather her discussions with Vanguard were simply "verbal back and forth" (Martin Dep. at 50).

In her Motion for Reconsideration, Ms. Martin cites to other testimony where she states that she had job offers from both Vanguard Flooring and Decorative Flooring and that she "turned [them] down in favor of Dupont." Martin Dep. at 229. Even if this testimony could be construed to conflict with her prior testimony on the issue of whether

she received a firm offer from Vanguard Flooring, it does not contradict her earlier testimony regarding reasons for turning down those positions in favor of DuPont's offer, reasons which were unrelated to the raise and bonus representations allegedly made by DuPont. Martin Dep. at 50-51.

Ms. Martin's argument with regard to alleged misrepresentations concerning the differences between salaried and commission salespeople is frankly confusing. On the one hand, Ms. Martin denies ever having been offered a choice between a salaried and commissioned sales position. E.g., Martin's Reconsideration Memo. at 11. On the other hand, Ms. Martin argues that DuPont misrepresented the differences between commissioned and salaried positions. Martin's Reconsideration Memo. at 8. Even setting aside these contradictory allegations, Ms. Martin presents no evidence that she relied on any such misrepresentation.

Similarly, Ms. Martin's argument that the fact that she obtained positions after leaving DuPont and that she obtained the Purdue sale, does not satisfy her evidentiary burden on the issue of detrimental reliance on DuPont's representations. In addition to case law suggesting that Ms. Martin's "[f]orbearance from seeking job opportunities is not sufficient to show detrimental reliance for purposes of promissory estoppel," Croslan v. Housing Auth. for the City of New Britain, 974 F. Supp. 161, 168 (D. Conn. 1997), Ms. Martin's evidence does not provide any "reliable indication of the number of jobs in her field possibly available to her," Ruling at 11. See DuPont's Mem. at 8-11, Reply Mem.

at 4-5, and First Supplemental Mem. at 4-7. Thus, absent any showing of detrimental reliance, summary judgment is appropriate.

C.  Breach of Covenant of Good Faith and Fair Dealing

On her Motion for Reconsideration, Ms. Martin objects to the Court's characterization of her contractual expectations as unreasonable. Martin's Reconsideration Memo. at 10. Because the reasonableness of Ms. Martin's expectations are fully addressed previously in the section concerning breach of contract, supra at 2-7, and in prior briefs, DuPont will not repeat that argument here. In addition, Ms. Martin argues that her constructive discharge would in turn constitute a breach of the covenant of good faith and fair dealing. DuPont has fully addressed Ms. Martin's constructive discharge claim in a prior brief and will not repeat that argument here. See Memorandum In Support of Defendants' Motion For Summary Judgment dated August 14, 2003 ("DuPont's Mem."), at 18-21.

D.  Sex Discrimination

In her Motion for Reconsideration, Ms. Martin rehashes much of her previous arguments all of which were amply addressed in prior briefs. See DuPont's Mem. at 11-21 and Reply Mem. at 5-7. In addition, Ms. Martin argues that her problems securing an adequate workforce and Jory Dennison's instructions to Judy Swan to give him referrals for new business were adverse employments actions, however neither of these circumstances should be a basis for reconsideration of the Court's Ruling.

Ms. Martin's attorneys claim that problems securing a workforce increased labor costs and "[a]s a result there were substantial periods where installers who worked on Ms. Martin's jobs received overtime, thereby cutting her sales commissions," Martin's Reconsideration Memo. at 11-12. There is no evidence supporting that claim. There is no evidence identifying the jobs on which labor costs were increased by this conduct, no evidence that quantifies the extent of the labor cost increase, no evidence identifies the effect on Ms. Martin's compensation and no evidence that that shows how the labor costs on Ms. Martin's jobs compared to labor costs on jobs handled by males salespeople.

Indeed, although Ms. Martin testified that she experienced labor problems in the first few months of employment, she also testified that, during a meeting Greg Keyes in the first month or two of her employment, she got permission to hire her own labor force gave her authority to hire her own work force, Martin Dep. at 89-94, and that once she had her own labor, her profit margin went up. Martin Dep. at 106. On this record Ms. Martin cannot show that her difficulties obtaining labor constituted an adverse employment action.

Similarly, Judy Swan testified that for approximately the first year of her employment she gave her leads exclusively to Ms. Martin. Deposition of Judy Swan, dated January 3, 2003. After Jory Denison complained that Judy Swan turn over all of her leads to Ms. Martin, Ms. Swan started turning over leads to Mr. Dennison. Id. Although Ms. Swan was questioned closely regarding the referrals made to Mr. Dennison, id. at page

10, line 9 – page 20, line 20, no similar examination was made of the referrals made to Ms. Martin. Absent evidence showing how Ms. Swan's referrals were distributed or that the additional referrals would have made a difference in her compensation, Ms. Martin cannot show that the referrals made to Mr. Dennison was an adverse employment action.

Finally, Ms. Martin argument that statistical information contained in DuPont's 2000 Affirmative Action Plan supports her disparate impact claim is without merit. A plaintiff in a disparate impact case must identify a "particular employment practice that cause a disparate impact on the basis of . . . sex." 42 U.S.C. § 2000e-2(k)(1)(A). Ms. Martin has not even attempted to satisfy this threshold requirement and she does not address the requirement in her Motion for Reconsideration.

The statistics to which Ms. Martin refers, is in fact information "derived" from the U.S. Census. As recognized by the Court in its Ruling, these numbers are meaningless because there is no relevant context provided for the numbers. Moreover, as previously argued in DuPont's earlier briefs, the Connecticut numbers are based on only five people, a number too small to make any valid statistical comparison. The Second Circuit has recognized that exceedingly small sample sizes can result in statistically unreliable evidence. <u>Lowe v. Commack Union Free Sch. Dist.</u>, 886 F.2d 1364, 1371-72 (2d Cir. 1989) (holding that the fact that two out of three candidates under age 40 received favorable ratings while only 16 out of 34 candidates over age 40 received such ratings did not support a disparate impact claim in part because of "the unreliability of such a small

statistical sample").  A plaintiff's statistics must meet a certain threshold level of substantiality.  See Smith v. Xerox Corp., 196 F.3d 358, 365 (2d Cir. 1999) ("Statistical data may be admitted to show a disparity in outcome between groups, but to make out a prima facie case the statistical disparity must be sufficiently substantial to raise an inference of causation."); E.E.O.C. v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus., 164 F.3d 89, 95 (2d Cir. 1998) ("[A] plaintiff's statistical evidence must reflect a disparity so great it cannot be explained by chance.").

On this record, there is no proof on which a jury could find for Ms. Martin on her discrimination claim and the motion for reconsideration should be denied.

## Conclusion

For the reasons set forth above and in the DuPont's prior briefs, the Court's Ruling properly granted summary judgment on all counts and the Motion for Reconsideration should be denied.

DEFENDANTS -
DUPONT FLOORING SYSTEMS, INC.
and DUPONT COMMERCIAL FLOORING SYSTEMS, INC.


By/s/ Hugh F. Murray, III
   Hugh F. Murray, III - ct 11418
   Marilyn B. Fagelson - ct 17202

Murtha Cullina LLP
CityPlace I - 185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
E-mail: hmurray@murthalaw.com
      mfagelson@murthalaw.com
Their Attorneys

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendants' Memorandum in Opposition to the Motion for Reconsideration was sent by first class mail, postage prepaid, on April 30, 2004 to Fern H. Paes, Esq. and Michael T. Paes, Esq., Paes & Paes, LLC, 4 Washington Avenue, Sandy Hook, CT 06482.

                                          /s/ Hugh F. Murray, III
                                          Hugh F. Murray, III - ct11418

724902